panel to consider and listen to the arguments here today. As you can see, Judge Kobus is in person. I'm participating remotely, and while you cannot see him, Judge Woolman is listening by audio. So while Judge Kobus and I will be engaging with the lawyers during their argument, rest assured that Judge Woolman is listening very carefully to your presentations as well. So with that introduction, will the clerk please call the first case for argument. The first case for argument is 21-3722 from the District of South Dakota, United States, versus Wicahpe Milk. Ms. Rich, Counsel, Judges, my name is Terry Pachoda. I'm representing the appellant in this case, Wicahpe Milk. Mr. Milk was convicted of conspiracy to distribute 500, over 500 grams of methamphetamine, possession of a firearm by a convicted felon, and obstruction. It started out as basically a conspiracy case, and shortly thereafter, the gun charge, and then months before trial, but subsequent to everything, he was charged on a superseding indictment with the additional charge of obstruction of justice. I've submitted a rather lengthy brief in this case, and I'm not sure that I'm going to be able to get through all of the arguments, but for the arguments that I don't get to today, I want the court to know that I'm not waived or taken from consideration of the court, those that I haven't addressed. I'd like to start my argument by talking about the sufficiency of the evidence, and the sentence in this case. The sentence was, is this, when the court, after reviewing the pre-sentence, imposed a sentence of 360 months. It was a life, it was a life sentence, so it was like I forget what, whatever the life sentence is, but she, this court judge Schreier sentenced him to 360 months. Now, on the basis of that, he had distributed 23.5 kilograms of methamphetamine. Now, the question is, how do you get from 156 grams, it was found in his car when he was arrested, to 23.5 kilograms in about six months? This guy had just gotten out of prison in California, and it was, I mean, we can talk about it, this isn't the jury, it was a second degree murder case. He gets out of prison in California, stays with some family friends, and family, actually, they weren't friends, it was his family in California, and the government's theory is that he then ran into some Samoans, who then were providing him with methamphetamines that was being then distributed to South Dakota. Ashapi Milk is a Native American, he was from Wombly, South Dakota, and the testimony at the trial was through Indian people that he knew on the reservation. Now, here's the thing. Counsel, just to confirm for me, what was the total amount attributed to your client at sentencing? 23.2 kilograms, Your Honor. That was the pre-sentence. So, there was 157 grams, that's the only amount that they could actually find him possession of, if, in fact, the meth in the car that he was arrested, and he was one of four persons in the car, if, in fact, those were his. Mr. Machado, though, the problem is there were so many, well, relatively speaking, there were a lot of details about bags of this and that, pounds here and there, eight balls, selling multiple times, 50 times. You know, the standard review on this is tough, right? So, you had a whole bunch of folks, and he was all over the place dealing, and then it's just hard to get over, I think, the standard of review here. It was up to the district court to take a hard look at all of this testimony, and the reality is there was a lot of testimony from a lot of different people about a lot of quantity. Let me talk about that, Judge. I agree. I agree that you're probably swimming upstream on the sentence under the I know that there's, it has to be shown to be a preponderance, but the court has also said that the, you know, the, for example, the quantities have to be reliable and corroborated. The court has to do, has to take a sensible review of the cases, including the Eighth Circuit. They have to be supported by other sources. You cannot extrapolate on weight where the evidence is unreliable. We have a court, U.S. v. Simmons, where it said that you can't, you can't extrapolate from something that somebody says who lacks credibility in the case, and Mr. Pichetto, what do you think that the correct, assuming the conviction, what do you think that the range should have been? What should the base offense level have been based on the quantity? Well, you know, when you look at it, Your Honor, the court did find that there is, that there was more than 500 grams. That was the determination. And then if you use that, if you use that, and I realize that you don't have to use that, but it seems to me that, you know, when you take whether or not what the, how the pre-sentence author calculated things and reached the determination on 23.2 kilograms, that one thing we do know is that the jury returned a verdict of more than 500 grams. I don't know why we don't use more than, I don't know why we can't use 30 grams, which is a base offense level of 30. And if you add the additions on, the additions for, well, there was eight points for additions at the 38. A 38, which is a guideline, is 292 to 365 months. Now, that seems to me... What was the range again, counsel? If you use, if you just take what the jury found, they found there was more than 500 grams. And that's a base offense level of 30. And the base offense, then you add on the additions, you know, there was eight of those, so eight points, so that's a 44. So with his guideline, he didn't have a bad criminal record because he'd spent most of his life in prison. He was a young man when he got convicted. It was a family deal. This wasn't a bank robbery or something. They were all drunk and wombly with his family, and one of the family members gets killed. So he, you know... So what do you think the range should have been on your quantity calculation? At the least, I don't want to say the least, but I think if you want to just consider what the jury found, we know the jury found more than 500 grams, 292 to 365, you know, is... He got a sentence within the range you're recommending. He got 360 months. That's a high rate, though. I mean, if you... It's below the high end of the range you're suggesting. If you... Sorry. Maybe I'm misunderstanding you, but isn't that within the range that you're suggesting we apply here? 360 months is within that range, true. So, you know, I... It is, but then we didn't get to argue, you know, for variance or anything like that. So, I mean, it was... You see what I'm saying? I understand, yes. So there it is. Okay. So then, you know, in this case, the quantities, the way they reached the quantities in this case, there was not one, there was not one... They never did find any methamphetamine that was actually taken, possessed, and examined to find out what the, you know, what the amount was. These were all estimates. I mean, they were just like, if you read the pre-sentence report, estimate, estimate, estimate. How can you make... What were the estimates based on, Mr. Pichetto? Was it... I mean, did any of the witnesses actually see him weigh it, or is this eyeballing the quantity? What was their best witness for that estimate? I'll tell you how they proved... I'll tell you how they showed, how they established quantities. They would take a Tupperware can, Tupperware, you know, a plastic Tupperware container, and they would say, well, is this about what the container looked like? Well, how, you know, how deep was it? What were the dimensions? Or they'd take a sheet of paper and say, well, was it about like that? And how deep was it? And then, what do you estimate it was? That's how they established quantities in this case, you know? Did the witness then estimate the weight, or did... Was there any kind of evidence presented like, well, if we put in to a Tupperware container of this size, a product that carries the same weight as this drug, that's the weight we would get? I don't believe there was any of that. I don't recall any of that in this trial. It's a week-long... It was a week-long trial. I mean, most of them were just estimate. What do you estimate it to be? You know, so, I mean... I mean, it's no more than guessing as to quantities, in my opinion. And... Mr. Verchota, I'll let you control your argument, and I defer to the presiding judge here, but how about the Sixth Amendment issue with the materials in the... The Sixth Amendment issue was... If you'd like, would you address that? Yes, I would. Your Honor, what happened was... There were a couple other trials before this one with... One was of a co-defendant at one time, and it was thought that Mr. Milk was trying to convince them, a couple people, by... He wrote a couple letters trying to tell them that they should not testify and what they should do, et cetera, et cetera. So they come through without a warrant, without a court order, in the middle of this case, after I had been working on this case for, you know, a year and a half or two years, and they cleaned out his cell. They took every single thing it was. There was hundreds of papers in there, and I moved to suppress. The district court judge said, well, I'm denying the motion, in part, but I'm granting it as to... The material that they granted the motion to suppress on, it was Bates 2895 to something else. It was about 10 pages of paper of witnesses' names, comments, weaknesses, you know, his mental impressions about these particular witnesses, and who, you know, and how the examination should take place. And the court said, okay, before you go into any of these witnesses, you have to have a hearing under Pelletier, and you have to find whether or not the government had an independent source before introducing the testimony from these particular pages. So, as I understand it, some of the documents that were suppressed got through the FBI agent's initial screen. They did. They got through the U.S. Attorney's Office screen team, and all of those documents, if I recall, were suppressed. Is that correct? Well...  That the district court found that were privileged. So my question is, what was the prejudice here? The prejudice was, there was no hearing held. There was no record made by the government as to whether there was an independent source. And these people were terrible. They presided, or they presented terrible testimonies to my client in this case, Your Honor. They testified about, you know, about quantities or what he had to do. You know, they shouldn't have been even... And I objected ever, if you look at my brief, I objected to every time they presented one of these witnesses because of the ruling that was made by the circuit court in this case. So are you saying, so is your... Maybe I'm understanding a little bit better. You're saying that when the witnesses testified for the government, you believe that the government had some information from the suppressed documents that they used in examination? Yes. Or, you know, the court said, here's the names of the people, you know? Of what people? The people whose names were on this, you know, were on... Well, you're saying the government obtained the identity of witnesses from the materials that were... I have no idea. I don't know how the government attained, you know, the identity of the witnesses that they called. I have no idea. I don't know any more than that at what time they did it. Did Agent Cooper testify? He did. That the government was aware of most, if not all? I don't... I'm not... Don't quote me on that. But at least the government was aware of the information prior to receipt of this information? I... He didn't say that. I don't believe he said that at trial. And if he said it... But wasn't this at a preliminary hearing of some sort? It was a suppression hearing. And then the court made its decision, and I appealed it to the circuit court, or to the district court, and the district court from the magistrate. But every time they got into the material that was suppressed, I objected. And there's a lot of objections in the record on this thing, on that. If I have, I don't have very much time left. There's one other thing that I want to raise, and that is the jurisdiction in this case. I realize 25 United States Code 841 is a general law of the United States. Now, we know that 841 is not part of the Major Crimes Act. We know it can't be under 13, 1152, because that's an exception for Indian versus Indian, or for matters that are left to the tribes under the treaties. And the tribe in this case has a very sophisticated criminal code on drugs. A lot of the matters that were transactions occurred on the Planning of the Indian Reservation. But you're asking us to make new law here, aren't you? No, I'm asking you to under, when you have a general criminal law of the United States, this is U.S. v. Dion. It came, this was a case, that case was appealed from this court. And the Supreme Court of the United States says, listen, you know, when you have a general law of the United States, and you're going to apply it on an Indian reservation, you have to find from the statutory language of the legislative history that it was meant to apply on the Indian reservation. The drug statutes in 21 U.S. Code do not apply to Indian reservations. I don't think that there's ever been a determination. They're not by this court, I don't believe. It's an open question. Now, the court, the government cites a lot of cases that talks about this particular subject. But those cases were all decided before U.S. v. Dion. And the standard that you have to apply. I will reserve the rest of my one minute, I guess, here for rebuttal, Your Honor. You may. Thank you. Ms. Ridge? Thank you, Judge, Mr. Picciotto, court. The United States here, the trial in this case lasted five days. And we called 24 witnesses, and 12 of those witnesses were drug-involved persons, either subordinates or customers or co-conspirators of Mr. Milk. And then 10 law enforcement officers were called who corroborated various testimony about locations and things of that nature. And then also talked about the collection of physical evidence. And so, the same judge who presided over the trial sentenced Mr. Milk and found that the United States had met their burden of proven by preponderance of the evidence, the drug quantities that were used of the 23 kilograms. All of those quantities, the court found, were part of this jointly undertaken criminal activity that Mr. Milk was involved in with Ms. Pourbaix, Mr. Brewer, and all these other individuals who testified. And that it was reasonably foreseeable to him that those quantities would be involved. The testimony involved was that Mr. Milk was the connection to the source of supply in California. He was living there originally, and he was the one who knew these people and arranged for the transportation of the meth to South Dakota. And that he took some of those trips, had family members take some of those trips before he ultimately moved to South Dakota. And then trips were made bringing the meth to him. And so, that all goes to the reasonable foreseeability of the quantities here. And then... As I sort of understand Mr. Pachauda, and I don't want to put words in his mouth, but this is sort of an example of the, what is it, the sentencing tail wagging the dog in the sense that the jury found 500 grams and the government comes in with 23 kilos on a preponderance with just Tupperware estimates. Can you help us understand a little bit more how you proved up those quantities if they're in fact, if Mr. Pachauda is correct, that there were no instances of actually weighing and it was truly the witnesses estimating a size based on a container? Sure, so we, in this trial, we kind of did it two different ways. Some of these witnesses are very experienced in eyeballing quantities. For example, Mr. Brewer had a prior drug conviction, was involved in this conspiracy, and these are people who are actively dealing in these type of quantities. So they know when they see a package of this size based on prior, their own prior personal experience in weighing quantities, that when I see that, that's about an ounce or that's about a pound. And so that was all elicited through testimony of them, what is the basis for their knowledge when they're viewing certain quantities. Some of them actually did see Mr. Milk weigh out certain quantities, such as Bobby Joe Hanley was one of the people who came to that Turtle Creek house and observed that happening. And other people also saw active weighing. But a lot of them, it was a lot of their own personal experience. Now, for some of the witnesses who didn't have that level of personal experience, such as Gladys Little Bull, Cheryl Little Bull, in their interviews leading up to trial, they would say it was, about the size of this piece of paper or the size of that notebook. And so we had Special Agent Dan Cooper, who's been investigating drug crimes for 30 years, testify at the tail end, as the last witness at trial, that in his training and experience, he knows that that would be about this amount. So there was some estimating, but it was done in a very specific, confined way to help the jury understand, when that witness says it was this size, what does that mean? And just give some context to that testimony. So we took both approaches there. So it was not just a guessing by some person who has no personal experience. There was context to it. We also didn't extrapolate the quantities. Sometimes in drug cases, it's done where, based on money transfers, that if somebody wires a certain amount of money, that would equal approximately this amount of methamphetamine, based on the common standard of cost. That wasn't done here. All of the quantities were estimated based on what people actually observed with their own eyes, or received directly from him. And so there wasn't a testimony that, oh, we heard, I heard that he brought in five pounds or something. It was all based on actual observations of persons who testified. And also, I wanted to clarify that this conspiracy lasted, I think there was a reference to six months, but January 2015 until his arrest in August 2017 is actually closer to 20 months. So the timeframe for the 23 kilograms is longer, and I think that puts into context that it's a little bit more understandable. As to the credibility of the witnesses, too, there was a lot of corroboration done between them about, for example, knowing when trips were made. So, you know, Don Dowdy and Harold Brewer had, you know, known that Don was, Harold knew that Don was about to leave on a trip because he'd seen her. And, you know, so things like that were done to corroborate that, you know, despite being drug users and despite a passage of time between trial and, you know, the actual conduct, that the things that they could remember were corroborated by other witnesses' testimony or by other things law enforcement was able to figure out. So we submit that all of that quantity was well supported. And even if there, it should, you know, the range there for the base offense level is 15 to 45. So it was sort of in the lower middle end of the range for the sentencing guidelines there. And so a lower range was not, would not be reflective of the level of quantity that methamphetamine that Mr. Milk was responsible for bringing in. And we don't know. I mean, juries aren't asked to decide, you know, base offense level, those level of quantities by their verdicts. All we know that the jury, it was that they believed that he had been responsible for at least 500 grams. But Judge Schreyer, who sat through the whole trial, found that their testimony was reliable for purposes of proving that quantity. The court had also asked about the jail cell search. I think the important starting point for that is that defendants don't have an expectation of privacy in their jail cells, and that's the Hudson v. Palmer case. The circumstances here were such that these witnesses had been in danger for years and continue to be in danger. And the circumstances leading up to that search were that the one person had already been assaulted by Mr. Milk, that's Cole Brewer, who's Harold Brewer's brother, at the Pennington County Jail where the search was done. The kites had already been collected by Harold Brewer Jr. as part of his proffer for purposes. And we use the term kites. At that particular jail, they're illicit notes. They're contraband notes that inmates are passing to each other in secret. They're not, in some facilities, I think kites are like actual formal communications with jail cells, but that's not the case at the Pennington County Jail, which Special Agent Cooper testified to. And then we also had that experience with Sam O'Rourke during the Brendan Jenise trial, who was a co-conspirator of Mr. Milk. And so there was, and then there was another witness, Gerald Baker, who testified in both trials, and he was actually assaulted and had his jaw broken. So assuming the search of the cell was appropriate, the district court ended up suppressing some of the information, right? And that was on the basis, what basis was that on? So what happened is initially the motion to suppress was filed based on violation of attorney-client privilege. And the small amount of documents that were provided to the prosecution team were used for that. And that went through the FBI screen? Correct. And then through your office's screen, is that correct? Correct, yep. And they were, and I say small amount because they took away, each took away a box of papers. And out of those box, there was just, you know, a small stack of papers that were actually provided to the prosecution team as being possibly relevant to witness tampering and witness endangerment issues. What happened is that after the evidentiary hearing, the defense raised work product, that there was, that these constituted work product. And so they were ultimately suppressed on that ground, not as a violation of attorney-client privilege. The, as I read the district court's order, document 294, about what was supposed to be done with the documents that were not suppressed, was that we weren't required to approach the court before we called any of the witnesses mentioned in the documents. It was before, if we were going to use any of those documents. And so... Were there any witnesses identified in those documents that you were not already aware of? No, no. The record is clear. Is that Agent Cooper's testimony? That's Agent Cooper's testimony, yep. And he was also one of the primary investigators in Brendan Genise's case, which it's really the same case, but they were just charged separately. And so he was well aware of who all those people were. And so I think the, I think the transcript on that was such that we did know all those names, so we didn't have any witness, excuse me, endangerment issues that we weren't already aware of. And that was one of the concerns, was that there was a lot of people being threatened who were not in custody. So it wasn't a matter of just removing them to a different facility or, you know, separating people. There's people out of custody, and do we have any responsibility of things to do for them that we're not already doing? So were these names that this, the work product had listed names that presumably were also in the discovery materials? Is that what you're saying? That's correct, Your Honor. That's correct. Okay. And so the objections at trial were, maybe it was to actually, was it to actually calling those witnesses, or was there a substantive objection? You're actually using information from my documents that were suppressed in order to examine this witness. Well, to avoid bringing the issue up in front of the jury, Mr. Petrotta would just reference the district court's order, document 294, and make his objection based on that, and then the judge would overrule it. And so, but my understanding is that that order did not prohibit us from calling those witnesses or using them, because we already knew who they were. We'd already interviewed them and provided that statement, the copies of their statements as discovery. And so my understanding of the order, the reading was that if we were going to use any of the documents that weren't suppressed, that was when we had to approach the court. That weren't suppressed? You had to approach, or were suppressed? That were not suppressed. And so we did offer several documents that were not suppressed, but because he, Mr. Milk was maintaining his objection to the use of those documents, that was when we were required to approach the court. And so that was when that was done, was for the particular documents, not the witnesses as a whole. But regardless, I think the record is that we already knew those people, and we already knew that information about them in both the suppressed and not suppressed documents. That that was already known to the government. When you say you knew that information, the identity of the witnesses, I guess what I'm understanding a work product objection would be, well even if you know, we all know that these folks are involved, that you got my thought process about how to handle these witnesses in examination or cross-examination. And that sort of seems the part that is the objection? Sure. And we knew both. We knew their identities. It was basically a list of people who we had already turned over their statements in discovery. And then we also knew some of the comment, all of the comments of work product things that were written next to them were such like drug user, felon, things of that nature. And so there was nothing in there that was something that we were not already aware of, and had not already provided as part of our own investigation. And so that was part of the questioning of Special Agent Cooper during the second suppression hearing. And so I think the record would show that, or does show that it didn't provide us any new information as to identity or content, or specifically ways that would impeach them or anything of that nature. As to, I think the final issue that was discussed was the jurisdiction, which this court reviews de novo. I think this court's decision in United States v. DRAPO controls that no notice is required to give to a tribe for the possible prosecution of a tribal member. And then here, the problem with the defense argument is that the conduct didn't just occur on the Pine Ridge Reservation. It didn't just occur in Rapid City. It didn't just occur in California. It occurred in all of those places over a period of time, repeatedly, with the nature of this conspiracy, like many conspiracies, involves quite a bit of travel. And so the United States would be the only entity that would have jurisdiction to prosecute him for the entirety of the conspiracy. And... But what if it didn't? What if it was just in Pine Ridge? Well, I still don't, I, the way that I read the Deion decision is that it still wouldn't be up. Okay, that, I mean, that's my question, right? I mean, is that, the government's position, as I understand, is that it applies even on Pine Ridge? Correct. Okay. Correct. Yes, the, you know, when Congress passed the Controlled Substances Act, was to deal with a nationwide problem anywhere in the nation, including the Pine Ridge Reservation. And so, as I read Deion, I don't read it the way that Mr. Pechota does, that that would, that it would be required to give notice, or that jurisdiction would not have been appropriate the way that we charged it. Yeah, right, as long as the elements of the offense were met, I think. Correct. Okay. Yep. As to the remaining arguments, we did submit quite detailed briefs, and I would argue that in the numerous rulings that were issued by the district court over the course of five years as we litigated this, that there was no abuse of discretion or clear error in any of the other rulings. Yeah, the jury verdict was supported by ample evidence, and the sentence was supported by the district court's rulings, applying the preponderance of the evidence standard, and I would urge this court to affirm. Thank you. Thank you. Your Honor, with respect to the amount of time that Mr. Milk was involved in this, into this conspiracy, he, he was on probation, supervised release in California, and was actually complying with the terms of the supervised release in February, until February, which then he absconded. And he was then picked up in Rapid City at this car stop that I talk about in my first assignment in August of that year. So that's six months that he was involved in any drug activities. In my brief, I talk about the amount of methamphetamines that people actually seen Mr. Milk with, or that could say, yes, you're associated with that amount, and it comes to 6,000 grams, is what I went through. And I made the same argument to the circuit court, or to the district court at sentencing in this case. And finally, I don't remember Cooper ever saying anything about this order of all this material that they took from this, took from this cell. And especially no testimony by him as to, he knew what the order was. He could have complied with it. We could have had the hearing, but they didn't. Thank you, Your Honor. Thank you. Thank you to both counsel for your arguments here today, and your briefing in the case. We'll take the matter under advisement.